In the Matter of the ESTATE OF William RECHTZIGEL, a.k.a. William H. Rechtzigel, Decedent.

No. C3–85–1551.

Court of Appeals of Minnesota.

April 22, 1986.

George L. May, Michael R. Strom, Hertogs, Fluegel, Sieben, Polk, Jones & LaVerdiere, P.A., Hastings, for appellant Marlin Rechtzigel.

Wayne P. Dordell, Hansen, Dordell, Bradt, Odlaug & Bradt, St. Paul, for respondent Marcella Lewis.

Heard, considered and decided by POPOVICH, C.J., and LANSING and HUSPENI, JJ.

## OPINION

HUSPENI, Judge.

This appeal is from a trial court order denying appellant's motion for amended findings or a new trial, and from a second trial court order admitting testator's will to probate. Appellant claims that: (1) testator lacked testamentary capacity, (2) respondent used undue influence to induce testator to make the will, and (3) the trial court erred in excluding a county real estate tax statement from evidence. We affirm.

## FACTS

Testator William Rechtzigel died on August 27, 1984, at age 86. He was survived by his only children, appellant Marlin Rechtzigel and respondent Marcella Lewis. Testator's wife had died in 1977.

On April 15, 1977, shortly after his wife's death, testator sold to appellant his farmstead of eighty acres on a contract for deed for $100,000. Interest was fixed at 6%. No balloon payment was provided in the terms of the contract. Testator offered to sell one-half of the farmstead to respondent, but she refused. Because testator felt the purchase price was too high, he annually discounted the sale price $6,000 from 1977–1980 as a gift to appellant, reducing the principal to $76,000. Testator retained a life estate in the house.

Both appellant and respondent cared for testator's needs between 1977 and 1984.

Appellant lived adjacent to testator and had daily contact with him. Respondent stopped by the farm at least once a week.

In 1980, respondent began to remove personal property from testator's house. She testified that each time she received testator's approval before taking the items which included a three-piece bedroom set, a sewing machine, and a set of silverplate dinnerware.

In June 1980, testator signed a new will at appellant's suggestion. Testator's previous 1972 will provided that in the event of either testator's or his wife's death, the surviving spouse would inherit everything and, in the event of both their deaths, appellant and respondent would inherit the estate equally. The 1980 will apportioned certain personal property to appellant and certain property to respondent and continued to provide that they equally inherit the residue.

Respondent was not informed of the new will, but discovered it accidentally about one month after its execution. Subsequently, in early 1981, she arranged a meeting with herself, testator, and her attorney Cole Oehler in an attempt to convince testator to change the 1980 will. Testator refused to change it.

In 1981, appellant petitioned for conservatorship of testator's property. In August 1981, Lawrence Broom, an unrelated party, was appointed conservator rather than appellant. With the court's approval, testator retained his checkbook and continued to write checks until his death.

Respondent testified that her father asked to see an attorney in late 1981. On December 22, 1981, respondent contacted her attorney Cole Oehler. Oehler drafted a new will based on suggestions from respondent.

On January 14, 1982, testator executed the new will. This 1982 will expressly revoked all prior wills and codicils. The new will gave appellant all testator's household goods, furniture, and tangible personal property in testator's house. Respondent was named personal representative and received testator's entire residue. The residuary clause provided:

*Residuary estate*—Having generously provided for my son, Marlin Rechtzigel, during my life by means of selling to him my farm on a favorable basis and by forgiving during my life some installments on my contract with him, and by giving him the household goods and furniture in and around my house at my death, I now want to equalize with my daughter to the extent possible. To that end I intentionally omit giving my son, Marlin, or any of his children or any of his more remote issue, any part of my residuary estate. Accordingly I give, devise and bequeath all the rest, residue and remainder of my property, real and personal, and wherever located, to my daughter, Marcella Lewis, or to her then-living issue by right of representation if she is not living at my death.

This clause represented a significant change. The 1972 and 1980 wills had both provided that appellant and respondent would share equally in the residue.

Attestation clauses were attached to the new will. Witnesses signed beneath a clause asserting testator's "sound mind and memory." The witnesses and testator signed beneath a clause asserting testator's free will and lack of constraint or undue influence. Testator initialed the first page of the will and signed the second one.

When the 1982 will was executed, testator, respondent, Oehler, Dr. Lawrence Swanson, and William Orf were all present. Dr. Swanson had been testator's physician. Orf was an 80-year-old family friend. Both acted as witnesses.

Before testator signed the will, Oehler read to the witnesses a legal definition of testamentary capacity. He then gave them a two-page typewritten questionnaire to use to test testator's comprehension. The witnesses and testator went to a separate room where testator was questioned. Respondent and Oehler remained outside. Dr. Swanson did most of the questioning. He testified that testator responded with-

out hesitation to the questions and seemed to have his faculties. Dr. Swanson did not know the correct answers to the questions, but he did write down testator's responses either by quote or paraphrase. Testator responded incorrectly to some questions. He responded his wife died two years before, instead of five years. When asked the size of his farm, his answer combined the total acreage of his farm with his son's own farm.

Dr. Swanson testified that he did not read the will to testator, but he believed Oehler went through the will with testator before testator signed. In a memorandum that Oehler wrote immediately following the will's execution, he stated that Dr. Swanson had said he himself read the will to testator. The responses that Dr. Swanson recorded on the questionnaire indicate that testator was aware of the 1982 will's contents. One of the questions that Dr. Swanson asked was:

Do you know that your will leaves all of the residue of your estate to your daughter, Marcella, and leaves to your son only your household goods and furniture and tangible personal property in and around your house?

Testator responded he did. Follow-up questions and responses confirmed his original answer. He also responded he was satisfied with the disposition to each of his children. With regard to appellant, Dr. Swanson's questions and testator's responses were as follows:

Are you satisfied with your treatment of [appellant]? Yes.

Are you satisfied that [appellant] takes only your household goods, furniture and the contents of your house? Yes.

You will not be sorry that you do not leave more under your will to [appellant]? No.

You have intentionally omitted giving to [appellant] or any of his children any part of your residuary estate? Yes. [Appellant] has already gotten his share.

After rejoining respondent and Oehler, testator was questioned by Oehler in the witnesses' presence. Testator declared the instrument to be his will and stated it accomplished his intent. The will was then signed by testator and the witnesses.

In March 1982, testator was placed in the Lyngblomsten Home in St. Paul. He remained there until his death twenty-nine months later.

On August 30, 1984, respondent sought to admit the 1982 will to probate. Appellant contested. On May 21, 1985, the trial court issued its findings of fact, conclusions of law, and order for judgment. The trial court found:

That at the time he executed the January 14, 1982 will, decedent possessed the necessary testamentary capacity to make a valid will.

That decedent's will of January 14, 1982, was not the product of undue influence.

By an order dated July 16, 1985, the trial court admitted the 1982 will to probate.

## ISSUES

1. Is the July 16 trial court order appealable?

2. Did the trial court err in finding testator had testamentary capacity?

3. Did the trial court err in finding testator was not unduly influenced?

4. Did the trial court err in excluding from evidence a 1977 real estate tax statement?

## ANALYSIS

### I.

Respondent claims the July 16 trial court order admitting testator's will to probate is not an appealable order. Minn.Stat. § 525.71 (1984) provides:

Appeals to the court of appeals may be taken from any of the following orders, judgments, and decrees issued by a judge of the court under chapters 524 or 525:

(1) an order admitting, or refusing to admit, a will to probate * * *.

Respondent's citation of case law in which two separate motions for a new trial were made is irrelevant. Such was not the case here. The July 16 order is appealable.

## II.

■ Appellant claims that testator, being confused and disoriented, lacked sufficient testamentary capacity to make a will on January 14, 1982.

[A] testator will be found to have testamentary capacity if when making the will the testator understands "the nature, situation, and extent of his property and the claims of others on his bounty or his remembrance, and he [is] able to hold these things in his mind long enough to form a rational judgment concerning them." *In re Estate of Healy*, 243 Minn. 383, 386, 68 N.W.2d 401, 403 (1955). The above-quoted definition of testamentary capacity was explained in *In re Estate of Jenks*, 291 Minn. 138, 189 N.W.2d 695 (1971), in which we stated that "[i]t is the generally recognized rule that testamentary capacity requires only that the testator have capacity to know and understand the nature and extent of his bounty, as distinguished from the requirement that he have actual knowledge thereof." *Id.* at 141, 189 N.W.2d at 697.

*In re Estate of Congdon*, 309 N.W.2d 261, 266 (Minn.1981). "Contestants of a will have the burden of establishing lack of testamentary * * * capacity * * *." Minn. Stat. § 524.3–407 (1984).

There is no basis for questioning the sufficiency of the evidence on appeal where such evidence justifies a finding either way.

*In re Estate of Healy*, 243 Minn. 383, 387, 68 N.W.2d 401, 403 (1955) (quoting *In re Estate of Forsythe*, 221 Minn. 303, 308, 22 N.W.2d 19, 23 (1946)).

At trial appellant presented evidence of testator's declining mental capacity. Michael Dobias, who had worked for appellant as a farmhand between late 1979 and early 1982, testified that he saw testator daily in late 1981 and early 1982. Dobias stated that testator acted strangely during that period; for example, he left raw hamburger on the kitchen counter for a week, watched television with the windows open while in his boxer shorts with the thermostat set at 80° during the winter, confused Dobias with his grandson, and once requested that Dobias take him home when testator was already at the farmhouse.

Ellen Hodkinson, a public health nurse who visited testator about every two months in 1981 and early 1982, was at the farm on January 13, 1982, and stated testator was confused and disoriented. Hodkinson seriously doubted whether testator had the ability to form a testamentary plan and remember that plan.

Respondent presented the testimony of Dr. Swanson, Orf and attorney Oehler, all of whom were present when testator signed the will. Dr. Swanson, who had administered the questionnaire to testator, stated that he believed testator was capable of knowing and holding in his mind the object, nature and extent of his bounty. Orf testified by deposition and stated that testator was mentally alert on January 14, 1982. Oehler testified also by deposition that he believed testator had the requisite testamentary capacity, although he depended entirely on the witnesses to make sure testator had the proper capacity.

Testator's capacity at the moment in time that he executed his will is critical. Those individuals present at that time stated that he had the requisite testamentary capacity as demonstrated by his conversation with them. The witnesses signed clauses attesting to that capacity. Testator was asked questions and he responded accurately to most of them. He inquired about the disposition of his property in the event respondent predeceased him. He stated that he knew who was to inherit from him and to what extent.

We recognize that testator was a victim of advancing years. Also, we believe it is a better practice for an attorney who drafts a will to discuss with the testator the terms of the will rather than leaving those duties to a witness, especially when the attorney is aware that the testator had previously

not wanted to change his will. Nevertheless, the trial court here was in the best position to judge the credibility of those witnesses who testified as to testator's capacity and as to the lack thereof. We find no error in the trial court's determination on that issue.

### III.

■ Appellant also claims that testator's 1982 will was the product of respondent's undue influence, and argues that his sister planned, dictated and engineered the will which deprived him of a share in the residuary estate.

Under Minn.Stat. § 524.3–407 (1984), contestants of a will have the burden of establishing undue influence. It is well settled that the will contestant must establish undue influence by clear and convincing proof. *In re Estate of Pundt*, 280 Minn. 102, 104, 157 N.W.2d 839, 841 (1968). Clear and convincing proof will be shown where the truth of the facts asserted is highly probable. *Weber v. Anderson*, 269 N.W.2d 892, 895 (Minn. 1978).

*In re Estate of Anderson*, 379 N.W.2d 197, 200 (Minn.Ct.App.1985), *pet. for rev. denied*, (Minn. Feb. 19, 1986). The trial court's finding will not be set aside unless clearly erroneous. *Id.*

Among the factors important in establishing undue influence are:

> the opportunity to exercise it, active participation in the preparation of the will by the party exercising it, a confidential relationship between the person making the will and the party exercising the influence, disinheritance of those whom the decedent probably would have remembered in his will, singularity of the provisions of the will, and the exercise of influence or persuasion to induce him to make the will in question.

*In re Estate of Wilson*, 223 Minn. 409, 413, 27 N.W.2d 429, 432 (1947).

■ Respondent did have the opportunity to exercise undue influence given her contact with testator, but so did appellant who also had close contact. "[O]pportunity

alone will not sustain a finding of undue influence." *Anderson*, 379 N.W.2d at 200.

Appellant claims that respondent actively participated in the will's preparation by telephoning her attorney, instructing him to prepare a will, and dictating to him the will's terms. Respondent testified that she contacted her attorney and told him her father wanted to make a new will. She suggested terms to her attorney that eventually comprised the will's residuary clause. Respondent drove testator to Dr. Swanson's office to execute the 1982 will and drove him home. This participation itself, however, is not conclusive of undue influence.

Appellant further argues that a confidential relationship existed between testator and respondent. Respondent did assist testator in caring for himself in late 1981 and early 1982. Their close relationship was not unusual given that testator was respondent's father.

> Although a confidential relationship may be a factor indicating undue influence, any evidence of intimacy or affection between blood relatives "negatives rather than proves undue influence."

*Id.* at 201 (quoting *In re Estate of Marsden*, 217 Minn. 1, 11–12, 13 N.W.2d 765, 771 (1944)).

Appellant also claims that because testator's previous two wills divided the residuary estate equally between appellant and respondent, testator, consistent with the intention expressed over several years, would have continued to provide for an equal division of the residuary had he not been unduly influenced by respondent. Respondent argues that testator did not change his expressed intention, despite the fact that he excluded appellant from sharing in the residuary. There is no evidence to support this argument. Appellant had purchased testator's farm for $100,000. In 1980, testator stated that the purchase price was equal to respondent's college expenses which the testator had paid. Subsequent to the sale, testator effectively reduced the purchase price to $76,000. In

1982, the market value of testator's farm had reached $180,000. The trial court noted in its memorandum:

> Although I have not made a specific finding that the farm was sold by decedent to contestant on favorable terms, there is evidence to support such a finding. * * * More compelling is the evidence that the farm had a substantial increase in value from the time of sale to the time of the execution of the new will. The evidence indicated decedent was a strong willed person and usually did what he wanted to do. Both sides seem to agree decedent wanted to treat his children fairly, and more or less equally. It is quite logical to conclude that decedent realized the increased value of the farm created a situation whereby proponent would receive substantially less than contestant if his prior will stood, and decided to rectify the situation by leaving the bulk of his residue to proponent. Such a conclusion is consistent with evidence that decedent wanted to treat his children fairly.

The trial court's observation is consistent with testator's response to Dr. Swanson when asked whether he "intentionally omitted giving to [appellant] or any of his children any part of [his] residuary estate." He replied, "Yes. [Appellant] has already gotten his share."

Appellant claims that the singularity of the will's provisions is obvious and that the entire will is favorable to respondent to the exclusion of appellant. Respondent argues that while the will may be singular, she and appellant were treated equally by their father when consideration is given to the farm's sale to appellant at less than market value and the subsequent increase in its market value by January 14, 1982. When the farm sale and appreciation are considered, it is apparent that appellant and respondent received approximately equal amounts from their father's estate.

Appellant argues that the 1982 will was a product of respondent's third attempt to induce testator to make a new will. In early 1981, respondent had arranged a meeting among herself, testator, and her attorney. Testator had refused to make a new will then. Respondent subsequently approached attorney David Grannis, who declined to write a new will. In December 1981, respondent contacted her attorney, who drafted the 1982 will which testator signed.

Appellant asserts that respondent's constant complaints regarding the low price that appellant paid for the farm unfairly influenced testator. Respondent testified that in late 1981 testator continually requested to see an attorney regarding a new will, and that it was at testator's urging that respondent contacted her attorney.

> Undue influence to invalidate a will must, at the very time the will is made, operate with such dominant and persuasive force that the will of the person exercising it is substituted for the will of the testator whereby the resulting written testament expresses the intent and purpose of that person and not that of the testator.
>
> Although the evidence to prove the subordination of the will of the testator to the control of another may cover a wide range and usually is circumstantial, the requisite clear and convincing proof of undue influence is not established merely by a showing of motive, opportunity, or disposition to use undue influence, or by showing the existence of a confidential relationship with the testator, or by revealing the inequality or unjustness of the will, or by a showing of a combination of any or all of these evidentiary factors. The evidence must go beyond suspicion and conjecture and show, not only that the influence was in fact exerted, but that it was so dominant and controlling of the testator's mind that, in making the will, he ceased to act of his own free volition and became a mere puppet of the wielder of that influence.

*In re Estate of Reay*, 249 Minn. 123, 126–27, 81 N.W.2d 277, 280 (1957) (footnotes omitted).

**834**

When questioned, testator stated that he was not threatened in any way, that he was not forced to make certain dispositions, and that he was making his will voluntarily. These statements were made outside of respondent's presence. He and the witnesses signed an attestation clause asserting testator's free will. While testator may have been influenced by respondent's behavior, the record does not demonstrate subordination of testator's will.

Giving due regard to the opportunity of the trial court to judge the credibility of witnesses and evaluating the entire record, we conclude that the trial court's finding of no undue influence was not clearly erroneous.

**IV.**

■ Appellant claims that he was prejudiced by the trial court's evidentiary ruling excluding a 1977 county real estate tax statement which would have demonstrated that his purchase price of testator's farm was in excess of its 1977 fair market value.

At trial Robert Lafond, a realtor and appraiser, testified and submitted appraisals of testator's farm based on sales of comparable property in the area. Lafond estimated the property's value at $180,000 on January 14, 1982. He also stated that a purchase such as appellant's was favorable to the buyer given market conditions in 1977. Appellant later testified and offered the tax statement. The trial court did not receive the tax statement into evidence.

Appellant asserts that the tax statement is admissible under *County of Ramsey v. Miller,* 316 N.W.2d 917 (Minn.1982), where an appeal was taken from a denial of motion for additur in a condemnation proceeding. The supreme court held that auditor's records showing the assessed value of property should be admissible. *Id.* at 922.

Respondent argues that the *Miller* court did not determine whether a tax statement could be received into evidence without supporting testimony regarding its preparation. She also argues that a 1977 tax statement relates to valuation of the farm as of January 1, 1976, and is therefore irrelevant.

The trial court justified its exclusion of the tax statement as follows:

[E]ven if it was error to exclude the tax statement, it is not prejudicial error. No finding was made that decedent sold the farm for less than its market value. The reason for an absence of such finding is that it is not relevant in this case, except as to the feelings of proponent.

We find no error in the trial court's exclusion of the tax statement under the facts of this case.

**DECISION**

An order admitting a will to probate is appealable. The trial court did not err in finding that testator had sufficient testamentary capacity and that testator was not subject to undue influence. Any error regarding exclusion of the county real estate tax statement was not prejudicial error under the facts of this case.

Affirmed.